## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| **STEPHEN J. GILLIS**, | ) | Chapter 7 |
| | ) | Case No. 16-12273-MSH |
| Debtor | ) | |
| | ) | |
| | ) | |
| | ) | |
| **JENZACK PARTNERS, LLC,** | ) | Adversary Proceeding |
| | ) | No. 16-1193 |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | |
| **STEPHEN J. GILLIS**, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## MEMORANDUM OF DECISION

## I. <u>Introduction</u>

In the only remaining count of a four-count amended complaint (ECF# 34), the plaintiff,

Jenzack Partners, LLC, seeks judgment against the defendant, Stephen J. Gillis, the debtor in the

main case, denying his discharge pursuant to Bankruptcy Code § 727(a)(4)(A).[1]  Jenzack

contends that Mr. Gillis made false oaths or accounts both in his written bankruptcy schedules

and statements and in his sworn testimony at the meeting of creditors conducted pursuant to

Bankruptcy Code § 341, specifically related to his involvement in a residential construction

---

[1] All references to the Code or Bankruptcy Code refer to title 11 of the United States Code, 11
U.S.C. § 101 *et seq*.

project at 82 Labor in Vain Road in Ipswich, Massachusetts owned by George and Tammy Sullivan.

## II. <u>Procedural History</u>

Jenzack's amended complaint contains four counts seeking denial of Mr. Gillis's discharge.  On November 8, 2017, I dismissed counts I (failure to keep or preserve books and records-§ 727(a)(3)) and IV (fraudulent transfer and de facto merger/successor corporate liability) for failure to state a claim under Fed. R. Civ. P. 12(b)(6), per Fed. R. Bankr. P. 7012(b) (ECF# 48). On May 23, 2018, I granted summary judgment in favor of Mr. Gillis on count III (withholding documents-§ 727(a)(4)(D)) (ECF# 63).  Count II, under § 727(a)(4)(A) for allegedly false oaths, is the only remaining count.

## III. <u>Findings of Fact</u>

In the parties' joint pretrial memorandum, they agree on certain underlying facts. Mr. Gillis, a home builder, organized EcoStar Homes, LLC ("EcoStar") on or about February 12, 2010. The Sullivans purchased the Ipswich property on or about September 30, 2013.  Jenzack is the holder of a judgment against Mr. Gillis dated October 7, 2013, issued by the Essex County Superior Court in the amount of $225,000.00, plus interest and fees. On or about December 17, 2013, the Superior Court issued an execution on the judgment against Mr. Gillis in the amount of $309,197.83. On or about January 14, 2015, pursuant to an order of the Superior Court dated August 26, 2014, Mr. Gillis transferred all of his right, title and interest in the capital stock of one of his companies, Gillis Homes, Inc., to Jenzack.  At the time Mr. Gillis filed his chapter 7 petition on June 14, 2016, he was an employee of EcoTech Construction, Inc. [JPTM at ¶ J]. The facts that could not be agreed to were presented at trial.  After carefully considering the evidence, I make the following findings.

*Mr. Gillis and His Companies*

Mr. Gillis completed high school and one year of college. He has worked in the home building industry for over 40 years, during which time he formed a number of business entities including EcoStar and Gillis Homes, Inc.  Mr. Gillis was the president and owner of Gillis Homes which he started in 2000 to build custom homes. The company built over 100 homes.  It ceased building homes in 2008 but otherwise continued to operate.  Mr. Gillis formed EcoStar, of which he was the manager and a 99% owner, in 2010 for the purpose of constructing single family homes using "green technology." Mr. Gillis is also a licensed real estate broker and performed brokerage services through Gillis Homes.

Mr. Gillis became indebted to Jenzack after Sovereign Bank foreclosed on one of his building projects.  As a result of the foreclosure, he owed money to Sovereign, and Jenzack purchased that debt.  After Jenzack purchased the Sovereign debt, it sued Mr. Gillis, resulting in the 2013 judgment.

*The Sullivans*

Mr. Gillis along with Louis Caputo, Mr. Gillis's accountant, and the Sullivans were long-time friends.  Mr. Gillis testified that he was involved in the Labor in Vain project from its inception, having identified the parcel for the Sullivans in 2013.  Mr. Gillis acted as their real estate agent through Gillis Homes, which received a commission, when they purchased the property in September of 2013 for over $1 million.  Mr. Gillis testified that apart from acting as a real estate brokerage, Gillis Homes had nothing to do with the Labor in Vain project.

Mr. Gillis traveled to Florida to meet with the Sullivans before the start of the Labor in Vain project to view the Sullivans' Florida home which they wanted to replicate in Ipswich.  He

also had other meetings and communications with them about the project, which he described as
preliminary.  He testified at trial that he had not built other multi-million dollar homes prior to
the Labor in Vain project.  He added that he considered the project to be a legacy home that he
could be proud of for the rest of his life.

Jenzack deposed Mr. Sullivan in 2017.[2]  Mr. Sullivan testified that sometime between
September 2013 and January of 2014, he and his wife decided to hire Mr. Gillis as their builder.
When asked at the deposition whether he was employing Mr. Gillis in his individual capacity or
through one of his businesses, Mr. Sullivan replied "I was employing Steve." He explained at
trial that he assumed that Mr. Gillis had a business entity but that he "didn't pay much attention
to it." At the deposition, Mr. Sullivan testified that although he had heard of Gillis Homes, he did
not recall EcoStar.  According to Mr. Sullivan, Mr. Gillis advised the Sullivans during the due
diligence phase of the project about the adjacent conservation land and what could be done with
the size of the lot's footprint.  Demolition of the existing house on the property was eventually
completed in January of 2014.

*The Due Diligence Phase of the Project and EcoStar*

Mr. Gillis testified that in 2014, EcoStar advised the Sullivans during the due diligence
phase of the project in order to determine whether they could build a house on the property.
EcoStar worked with site engineers to develop the house plans. He testified that he, through
EcoStar, performed these services in the range of 5-8 hours per week but never invoiced the
Sullivans for the work and that neither he nor EcoStar ever sought or received payment for the
services from the Sullivans, although EcoStar aggregated invoices from other vendors who had
performed work on the project for the Sullivans to pay.  When asked why EcoStar provided

---

[2] The transcript of the deposition was not admitted into evidence, but Mr. Sullivan read portions of it into the record.

services without payment, he testified that it was a common practice not to seek payment during this "audition period."

*End of Due Diligence Phase*

Mr. Gillis testified that the due diligence process with respect to the Labor in Vain project concluded toward the end of 2014 and that the foundation for the new house was poured sometime between November and December of 2014.  By that time, he testified, he knew the Labor in Vain project would require "110%" of his time and effort because the location and construction presented complexities and the project needed his "constant on-site attention in order to have it done properly." His financial condition at that time was shaky because he had no access to bank credit which he felt he would need for the Labor in Vain project due to the potential need to buy equipment. To add to his worries, in the fall of 2014, he became aware that there was competition for the project as another builder, Premier Builders, was inquiring about the building plans for the project. Mr. Gillis considered Premier to be serious competition.

*The Project and EcoTech*

Mr. Gillis testified that Mr. Caputo, his accountant, was familiar with his precarious financial situation and that the two discussed the Labor in Vain project in late 2014.  According to Mr. Gillis, Mr. Caputo formed EcoTech and offered him a job as its construction manager to build the Labor in Vain house.  This appealed to Mr. Gillis, he testified, because it allowed him to do what he did best.  Mr. Gillis testified that EcoTech was formed on November 4, 2014, a date after Jenzack obtained the execution against Mr. Gillis and was trying to obtain the stock of Gillis Homes.  He added that it was not he, but Mr. Caputo, who formed EcoTech and that he had no financial interest in the company.

Mr. Gillis testified that he worked for EcoTech "from the beginning" and, in connection with his work he managed sub-contractors on the Labor in Vain project and received invoices from vendors which he then aggregated for invoicing to the Sullivans. He testified that he and Mr. Caputo hoped that the Labor in Vain project would be a stepping-stone for EcoTech's future projects, and that the Sullivans indicated to him that they would be amenable to showing the house to other EcoTech clients.

Mr. Sullivan testified that in 2014, he had discussions with Mr. Caputo about the formation of a new entity for which Mr. Gillis would be a builder, although he did not know the details of the arrangement. Following those discussions, he testified, EcoTech began handling the business aspects of the project including aggregating the invoices.  He added that, as the project progressed, most of his conversations about costs were with Mr. Caputo.  Mr. Sullivan further testified that the project construction manager would receive a fee equal to 10% of the total cost of the project which he discussed with Mr. Gillis.  When asked who would receive the 10% construction management fee, Mr. Sullivan testified "I don't know that I ever really thought about it.  [Mr. Gillis] was building the house for me . . ."  and he did not know what arrangement Mr. Gillis otherwise had. No evidence was introduced that the construction management fee was ever paid or to whom it was paid.

*Communications Between Mr. Gillis and Timothy Tanner*

Attorney Timothy Tanner represented the Sullivans in connection with the purchase of the property, and he drafted a construction services agreement for the new home starting in September of 2014, prior to the formation of EcoTech, although the contract was never finalized, as discussed further below.

Mr. Tanner emailed Mr. Gillis on November 28, 2014, sending him an initial draft construction services agreement for the Labor in Vain project for his review, which named "Gillis Homes and/or Steven Gillis" as the construction manager, and Mr. Gillis testified at trial that he recalled seeing the email.   On November 29, 2014, Mr. Gillis replied to the email, indicating he would review the draft contract. There is no indication that the emails or the draft agreement were ever forwarded or copied to Mr. Caputo.

Mr. Tanner testified that the name of the construction manager on the draft agreement changed at some point when Mr. Gillis gave him an EcoStar business card and asked him to change the name to EcoStar, and Mr. Tanner made the change.  He testified that the last draft of the construction services agreement in early 2015 was changed again to reflect the name of EcoTech as the construction manager.  So, in various drafts of the construction contract, the name of the construction manager was alternatively "Gillis Homes and/or Steven Gillis" "EcoStar," or "EcoTech." Mr. Tanner testified that he primarily dealt with Mr. Gillis as the builder on substantive issues and that he had no substantive discussions about the contract other than with Mr. Gillis. He later clarified that the nature of the communications concerned the technical details about the construction job.

Mr. Sullivan emailed Mr. Gillis on December 14, 2014, requesting that Mr. Gillis and Mr. Tanner come to an agreement on the construction contract, to which Mr. Gillis replied the following day "Have message into Tim [Tanner], we will get it done."  On January 13, 2015, Mr. Tanner emailed Mr. Gillis, sending him a revised agreement which Mr. Gillis replied he would review the following day.  In an email from Mr. Tanner to Mr. Gillis dated February 19, 2015, Mr. Tanner indicated that, after talking to Mr. Sullivan "it was determined that we needed to add your name to the [construction agreement draft] document and specifically tie it to the

performance of the agreement, as it is you and your expertise that George is requiring to oversee

the project, not EcoTech LLC and Louie [Caputo]."

Mr. Gillis explained the emails about the draft contracts.  He said that other than

preliminary drafts, he referred the draft contracts to Mr. Caputo because he "was going to handle

the contract work" on the Labor in Vain project, and Mr. Gillis added that he was not authorized

by EcoTech to negotiate contracts on its behalf.  He testified that to his knowledge, no contract

was ever signed between the Sullivans and EcoTech.  Both Mr. Sullivan and Mr. Tanner testified

that no contract was ever finalized or signed for the Labor in Vain project, which Mr. Tanner

said was due to a disagreement among the parties about construction costs.

*Project Permitting*

Jenzack produced an "Order of Conditions" issued on October 18, 2013, by the

Massachusetts Department of Environmental Protection with respect to the Ipswich property.

The document references a "Notice of Intent Plan 82 Labor-in-Vain Rd., Ipswich, MA for Gillis

Homes (Sullivan owner)" prepared by Meridian Associates, Inc., who Mr. Gillis testified was the

site engineer for the project.  The Town of Ipswich issued a demolition permit on January 9,

2014, for the demolition of the house then located at the property.  Mr. Gillis is listed on the

permit as the "Contractor/Applicant" and it was issued nearly 11 months before the formation of

EcoTech in November of 2014.  The town also issued a building permit for the foundation of the

new house on the property dated June 13, 2014, and listed Mr. Gillis as the licensed construction

supervisor, again months before EcoTech was formed.  The final building permit issued for the

Labor in Vain project was issued by the Town of Ipswich on December 29, 2014, after EcoTech

was formed, and listed Mr. Gillis thereon as the licensed construction supervisor. Mr. Gillis

testified that the practice in the Town of Ipswich is for the construction supervisor to apply for

permits, not his company or business entity.  He testified that as a construction management

company, EcoTech customarily obtained building permits and that, as an employee of EcoTech,

one of his roles was to obtain building permits on its behalf and that he had the necessary

construction supervisor's license to obtain the permits.  He testified that the construction of the

house began in January of 2015.

*Project Invoices*

EcoStar aggregated certain vendor bills related to the project and sent five invoices to the

Sullivans from December 12, 2013 through October 9, 2014, directing them to make checks

payable to different vendors. On November 25, 2014, after EcoTech was formed, EcoTech sent a

sixth invoice to the Sullivans for the project.  The letterhead, logo, and motto used by EcoTech

on invoice no. 6 were similar to those on invoice nos. 1-5 of EcoStar and both sets of invoices

listed the same office address.

After EcoTech was formed in November of 2014, it began to aggregate invoices for the

Sullivans to pay on the project. Mr. Gillis testified that he did business with Express Sign &

Graphics, Inc. for the purchase of custom signs for the driveway of the Labor in Vain house.

Jenzack produced a number of invoices for the signage at the Labor in Vain property which

contained the names of three different customers: Gillis Homes, EcoStar, and EcoTech for

various dates in 2013 and 2014. Mr. Gillis testified that after he received the invoices, he did not

recall taking any action to advise the sign company that the project was not a Gillis Homes' job.

He added that he did not prepare the invoices.

Mr. Gillis testified that Piping Specialties, Inc. supplied materials on the Labor in Vain

project.  Jenzack produced an invoice and packing slip from Piping Specialties dated November

12, 2014, issued to Gillis Homes which was initialed by Mr. Gillis.  Others were dated

November of 2014, the month EcoTech was formed, and all were issued to Gillis Homes.  One

of the packing slips dated September 14, 2016, a date after Mr. Gillis filed bankruptcy and after

his transfer of the Gillis Homes stock to Jenzack, was also issued to Gillis Homes.

Jenzack produced invoices from Dave's Septic Service, Inc. in connection with the

project.  Invoices dated February 7 and March 7, 2015, were issued to EcoStar, after it had

stopped work on the project, and an invoice dated April 4, 2015, was issued to EcoTech.  Mr.

Gillis testified that he approved these invoices.

Mr. Gillis testified that he did not hold out the Labor in Vain project as a Gillis Homes

job.  He explained that Gillis Homes, which operated for years and built over 100 homes, did

business with Meridian Associates, Express Signs, Dave's Septic, and Piping Specialties in

connection with projects other than the Labor in Vain project. He maintained that neither he nor

EcoStar ever represented to any of the vendors that the Labor in Vain project was a Gillis Homes

project, that the project was never a Gillis Homes project, and that he did not pay close attention

to the names on the invoices because "it had no significance . . . to me at the time."  He testified

that in 2014, Gillis Homes was finishing up a project in West Newbury, Massachusetts and had

not been in the business of building single family homes since 2007 or 2008.  He added that he

continued to use a prior Gillis Homes email address in 2013 and 2014 in connection with the

Labor in Vain project, even after Gillis Homes was no longer building homes, out of

convenience because "ninety-five percent of the people in the building industry in eastern

Massachusetts where I did business, that is how they would get ahold of me."

*Project Costs and Termination*

At trial, Mr. Gillis clarified that, to his knowledge, there was never a signed contract for

the project by the Sullivans, and that he did not know the amount of the contract at the time of

the § 341 meeting.  He did know some details of the arrangement, however, including that the

construction manager, who he said would be the construction company and not an individual,

was to receive 10% of the total construction price of the project, which he testified was initially

about $4.2 million. He approximated that the final construction cost was somewhere in excess of

$5 million, but he was not sure.  Despite attempts by Jenzack to pin Mr. Gillis to a figure, Mr.

Gillis testified that the project cost fluctuated, and he did not know the figure with any certainty.

Mr. Gillis prepared on behalf of EcoStar a "Potential Estimated Savings Document" for

the project, dated September 25, 2014, predating the formation of EcoTech. He testified that the

purpose of the document was to show areas of potential savings on the project for the Sullivans,

with a potential estimated savings of $274,868 and a commensurate reduction to the construction

management fee.  When asked at trial if he had a good idea of the costs and pricing associated

with the Labor in Vain project, Mr. Gillis testified that it was a moving target.

Mr. Gillis also prepared a 16-month estimated cash flow statement for the project, on

EcoStar letterhead dated August 20, 2014, for the purpose of showing Mr. Sullivan potential

cash outlays.  The document reflected a projected construction budget of $3,723,144 and a 10%

management fee of $372,314.  Jenzack presented an EcoStar document entitled "Addendum B"

in connection with the project, also dated August 20, 2014, which showed a construction budget

and a management fee in the same amounts as set forth in the cash flow statement.  Mr. Gillis

testified that the documents reflected what potential costs might be at the time they were

prepared.

Mr. Gillis testified that the Sullivans set up a petty cash account to pay expenses for the

Labor in Vain project and that he had signatory authority on the account.  He further testified that

Mr. Caputo also had signatory authority and that the account was owned by Mrs. Sullivan who

also had access to the funds and could remove them at any time.  He maintained that he had

physical possession of an account checkbook due to the need to buy fuel and remove large

quantities of snow that fell during the winter of 2015 and to make other small purchases for the

project.

Mr. Sullivan testified that Mr. Gillis worked on the Labor in Vain property for "the entire

time" and that EcoTech was terminated from the project on September 27, 2016, when the

Sullivans sent a termination letter to Mr. Caputo, as president of EcoTech, which, in part,

provided: "The agreed upon substantial completion date for the Project was June 1, 2016 and the

project remains incomplete."  At some point, Premier Builders took over the project.

Notwithstanding the termination of EcoTech, Mr. Gillis testified that he continued to work on the

project until its completion directly for the Sullivans at their request.

*Schedules, Statements, and the § 341 Meeting*

Mr. Gillis filed his chapter 7 petition on June 14, 2016 and filed his original schedules

and statements a month later on July 17, 2016. He appeared and testified at his § 341 meeting on

August 11, 2016, and at a continued meeting on October 11, 2016 [ECF# 21]. He filed amended

schedules A/B, E/F, and an amended statement of financial affairs and matrix on October 11 and

12, 2016.

On Mr. Gillis's Schedule I filed on July 17, 2016, he reported that he had been employed

by EcoTech as a project manager for 12 months, even though the company was formed in

November of 2014 (20 months prior). He testified that the schedule was accurate when he

prepared it, but he had failed to update it before the bankruptcy filing.  Hence, the schedule was

not accurate when it was filed.  He testified at trial that it took him several months to prepare his

bankruptcy schedules before they were filed with the court, and he maintained that his answer

was correct on the date he provided the information to his bankruptcy attorney.  He did not

realize the "12 month" answer was incorrect when the schedules were filed.

In response to Question 13 of the original statement of financial affairs ("SOFA")

"Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more

than $600 per person?" Mr. Gillis answered "No."  In response to Question 18 of the original

SOFA "[D]id you sell, trade, or otherwise transfer any property to anyone, other than property

transferred in the ordinary course of your business or financial affairs" within two years of the

bankruptcy filing, Mr. Gillis responded "No."  He testified at trial that he understood the latter

question to require information only about *his* transfers and not those of any companies he

owned, and that his answer was truthful.

In response to Question 23 of the original SOFA "Do you hold or control any property

that someone else owns? Include any property you borrowed from, are storing for, or hold in

trust for someone," Mr. Gillis responded "No."  He testified at trial that he did not list the

Sullivan petty cash account in response to Question 23 "because it was not my money" and "I

did not control it" even though he conceded that he could have withdrawn funds from it.

In response to Question 27 on his original SOFA concerning whether he owned and/or

was an officer or director any businesses within the four years prior to the bankruptcy filing date,

Mr. Gillis listed ten different entities including EcoStar and reported the period of February 12,

2010, through January 22, 2014, as the dates the business existed.  Mr. Gillis acknowledged at

trial that the ending date of January 22, 2014, was inaccurate.  He testified that he should have

used the ending date of January 22, 2015, but he mistakenly used the date of January 22, 2014,

because that was the date that EcoStar filed its last annual report with the Massachusetts

Secretary of State and such reports are "good for a year."  He added that he made a similar

mistake with respect to another entity listed in response to Question 27 on the SOFA.  He

testified that at the time he answered Question 27, he did not know he had made an error with

respect to the ending date of EcoStar and that he amended the SOFA when he later learned the

ending date was inaccurate.

*The § 341 Meeting*

Mr. Gillis's § 341 meeting of creditors was conducted on August 11, 2016 and continued

to October 11, 2016 [ECF# 21]. The testimony recounted below was given at the first meeting

held in August of 2016.  He testified at the meeting that Gillis Homes ceased operations when

the Superior Court ordered him to tender the company's stock to Jenzack.  When asked at the

meeting by the chapter 7 trustee why EcoTech was formed in 2014, Mr. Gillis replied that he did

not know, that the company was formed by Mr. Caputo and that he was "just an employee."

When asked when he began working for EcoTech, he replied "last year" referring to 2015.

Mr. Gillis also testified at the meeting that EcoTech acquired building permits through

him and not through Mr. Caputo. Jenzack asked Mr. Gillis at the meeting whether he dealt with

customers "in obtaining contracts" on behalf of EcoTech, and Mr. Gillis responded that he did

not, but that Mr. Caputo did.  At trial, Mr. Gillis clarified that he understood the question to

mean "signed contracts" and that he was not authorized to obtain signed contracts from

homeowners by EcoTech or negotiate contracts on its behalf and that he truthfully answered the

question at the § 341 meeting.

Mr. Gillis testified at the meeting that Mr. Caputo dealt with customers who were

"building new houses on behalf of EcoTech" and that EcoTech had only one client.  When asked

by Jenzack at the meeting to name the client, Mr. Gillis paused and was directed by his attorney

to answer the question. Although he paused before answering, Mr. Gillis did answer the question

and responded that the Sullivans were EcoTech's only client.  When asked what EcoTech was doing for the Sullivans, he replied "we're building them a house."  At trial, Mr. Gillis explained that he paused before answering the question and giving the Sullivans' name because he did not want to involve them in his "mess."

Jenzack questioned Mr. Gillis at the meeting about the status of the Labor in Vain project:

Q: "What stage of construction are you in?"

A: "Seventy-five percent complete."

Q: "When was it started?"

A: "Uh, beginning of last year. So a while back . . ."

Mr. Gillis testified at trial that he understood these questions about the project to concern the date construction of the new house began which was in early 2015.

When asked certain specific questions at the meeting about the project contract such as "how much is the contract for that house, roughly?" he testified that he did not know and when asked "when was the contract first initiated?" Mr. Gillis testified that he did not know and that he "wasn't . . . privy to the contract."  At trial, he testified that he did not know the amount of the contract at the time of the § 341 meeting.

When asked at the meeting when he began working for EcoTech, he testified "last year" in reference to 2015, even though the company was formed in November of 2014.  Mr. Gillis testified at the meeting that no assets of Gillis Homes were transferred to EcoTech.  When asked at the meeting whether there was any "carry-over" of any contracts or projects of any kind from Gillis Homes to EcoTech, he replied "No."

# IV. <u>Conclusions of Law</u>

## A. Applicable Law

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).  Code § 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless -- . . . (4) the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account[.]" 11 U.S.C. § 727(a)(4)(A).  A plaintiff bears the burden of proof on an objection to discharge.  Fed. R. Bankr. P. 4005. The denial of a debtor's discharge under § 727 requires proof of grounds for such relief by a preponderance of the evidence. *Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir. 1994) (applying the rationale of *Grogan v. Garner*, 498 U.S. 279, 291 (1991) to § 727 actions). "[T]he statutory right to a discharge should ordinarily be construed liberally in favor of the debtor." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted). "A debtor's discharge should not be denied under § 727(a)(4)(A) if the false statement is due to mistake or inadvertence . . . or if the mistake is technical and not real." *Gordon v. Mukerjee (In re Mukerjee)*, 98 B.R. 627, 629 (Bankr. D.N.H. 1989) (citations omitted).

In *Lussier v. Sullivan (In re Sullivan)*, 455 B.R. 829 (B.A.P. 1st Cir. 2011), the United States Bankruptcy Appellate Panel for the First Circuit reaffirmed the well-settled standard adopted by the United States Court of Appeals for the First Circuit in *In re Tully* for complaints under § 727(a)(4)(A):

> The First Circuit has dissected the language of § 727(a)(4)(A) into two parts: (1) the plaintiff must show that the debtor knowingly and fraudulently made a false oath; and (2) the false statement must relate to a material fact. *See In re Tully*, 818 F.2d at 110. Further, "the burden of proof rests with the [plaintiff] but once it reasonably appears that the oath is false, the burden falls upon the [debtor] to come forward with evidence that he has not committed the offense as charged." *Id.* (citing *In re Shebel*, 54 B.R. 199, 202 (Bankr. D. Vt. 1985) and quoting *In re Mascolo*, 505 F.2d 274, 276 (1st Cir. 1974)) (internal quotation marks omitted).

*In re Sullivan*, 455 B.R. at 837. "[T]he inquiry can be restated as whether (i) the debtor made an oath (ii) that was false and (iii) related to a material fact in the case (iv) knowingly and (v) fraudulently." *Irish Bank Resolution Corp. Ltd. (In Special Liquidation) v. Drumm (In re Drumm)*, 524 B.R. 329, 394 (Bankr. D. Mass. 2015), *aff'd*, No. 15-CV-10184-LTS, 2015 WL 9911447 (D. Mass. Nov. 20, 2015) (citing *Commonwealth of Massachusetts v. Bartel (In re Bartel)*, 05-13134-JBR, 2009 WL 2461727 at *5 (Bankr. D. Mass. Aug. 10, 2009)).

A debtor's schedules and statement of financial affairs are the equivalent of a verification under oath. *Perry v. Warner (In re Warner)*, 247 B.R. 24, 26 (B.A.P. 1st Cir. 2000) (citing 28 U.S.C. § 1746). *See also* Fed. R. Bankr. P. 1008. Statements made at a § 341 meeting also constitute statements under oath for purposes of § 727(a)(4)(A). *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 922 (Bankr. D. Utah 2006) (footnote omitted). False oaths can include affirmative misrepresentations as well as omissions of assets, income, and transfers. *See Olympic Coast Inv., Inc. v. Wright (In re Wright)* 364 B.R. 51, 73 (Bankr. D. Mont. 2007), *aff'd*, CV 07-053, 2008 WL 160828 (D. Mont. Jan. 16, 2008), *aff'd*, 340 Fed. Appx. 422, No. 08-35122, 2009 WL 2431365 (9th Cir. Aug. 10, 2009) ("A false oath may involve a false statement or omission in the debtor's schedules.") (quoting *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999)).

"A statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made without belief in its truth, or made with reckless disregard for the truth." *Carto v. Oakley (In re Oakley)*, 503 B.R. 407, 426 (Bankr. E.D. Pa. 2013) *aff'd*, 530 B.R. 251 (E.D. Pa. 2015) (quoting *Montey Corp. v. Maletta (In re Maletta)*, 159 B.R. 108, 112 (Bankr. D. Conn. 1993)). "[N]ot caring whether some representation is true or false—the state of mind known as 'reckless disregard'—is, at least for purposes of the provisions of the

17

Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (citing *In re Yonikus*, 974 F.2d 901, 905 (7th Cir.1992); *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992); *In re Tully*, 818 F.2d at 111).

"Knowingly and fraudulently made false statements exist if a debtor 'knows the truth and nonetheless willfully and intentionally swears to what is false.'" *JP Morgan Chase Bank, N.A. v. Koss (In re Koss)*, 403 B.R. 191, 213 (Bankr. D. Mass. 2009) (quoting *In re Mukerjee*, 98 B.R. at 629 (citations omitted)).  "The intent required by § 727(a)(4)(A) is satisfied by a showing of reckless disregard for the truth." *Robin Singh Educ. Serv., Inc. v. McCarthy (In re McCarthy)*, 488 B.R. 814, 826 (B.A.P. 1st Cir. 2013) (citing *In re Tully*, 818 F.2d at 112 (acknowledging that "reckless disregard to the truth" has "consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A).")).  "Direct evidence of fraudulent intent is not required; rather, it is sufficient to prove by circumstantial evidence either a pattern of concealment and errors or other conduct that suggests reckless indifference to the truth[,]" *In re Senese*, 245 B.R. at 575, including the "cumulative effect of a series of innocent mistakes." *In re McCarthy*, 488 B.R. at 826 (quoting *Discenza v. MacDonald (In re MacDonald)*, 50 B.R. 255, 259 (Bankr. D. Mass. 1985)).  In addition, "[i]t is well established that the use of sophistication is appropriate in determining fraudulent intent, whether it be in proving that intent did not exist, or that it did exist and should not be ignored." *Rossi v. Moreo (In re Moreo)*, No. 07–71258-dte, 2008 WL 5110967, at *4 (Bankr. E.D.N.Y. Dec. 2, 2008) (citations omitted).  "[A]ll that is needed for the denial of discharge under § 727(a)(4)(A) is a single false account or oath." *In re Koss*, 403 B.R. at 213 (citing *Schreiber v. Emerson (In re Emerson)*, 244 B.R. 1, 28 (Bankr. D.N.H. 1999)).

A false oath is material if its subject matter "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property[.]" *Tully*, 818 F.2d at 110-11 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)). "[T]he threshold to materiality is fairly low." *In re Sullivan*, 455 B.R. at 839 (quoting *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000). *See In re Tully*, 818 F.2d at 110 n.4 ("[V]aluation is not really the point."); *see also In re Chalik*, 748 F.2d at 618 ("The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious."). "An inference of fraud is permissible when a debtor files an amendment only as a result of developments during or after the creditors meeting, or without adequate explanation of the initial inaccuracy." *Distributor Corp. of New England v. Zicaro (In re Zicaro)*, No. 07-43732-JBR, 2009 WL 1795302, at *3 (Bankr. D. Mass. June 22, 2009).

## B. Analysis

Jenzack asserts that Mr. Gillis made 14 statements in his schedules, SOFA, and at the § 341 meeting concerning the Labor in Vain project which constitute false oaths warranting denial of his discharge under Code § 727(a)(4)(A).  It argues that while some of the alleged false statements may appear trivial, the record reflects an overall pattern of deception by Mr. Gillis intended to distance him from the project and that, but for the "transfer" of the project from one of his business entities to EcoTech in 2014, the monies realized from the project would have been assets of his bankruptcy estate. It further maintains that the cumulative effect of the alleged falsehoods reflects Mr. Gillis's intention to conceal material information about his business transactions from the chapter 7 trustee and creditors.

At the outset, I note that on November 8, 2017, I dismissed count IV of the amended complaint entitled "Fraudulent Transfer and De Facto Merger/Successor Corporate Liability as Basis for Denial of Discharge . . ." for failure to state a claim.  That count was based on the allegations that the Labor in Vain project "was transferred from Gillis Homes and/or EcoStar to EcoTech under the direction and control of [Mr. Gillis] acting in his capacity as President or Manager of those entities[,]" and that "said transfer was made with the intent to hinder, delay or defraud creditors . . . ." Amended Complaint ¶¶ 135, 139.  Although it did not prevail on its theory in count IV that Mr. Gillis fraudulently transferred the project, through companies he controlled, to EcoTech to protect the construction management fee from creditors, Jenzack recycles the theory as one for false oath in count II.  I will discuss each allegation of false oath in turn below.

The first eight of the alleged false oaths were made by Mr. Gillis at his § 341 meeting.

1.    Mr. Gillis did not know why EcoTech was formed in November of 2014

The trustee asked Mr. Gillis at the § 341 meeting why EcoTech was formed in 2014.  He responded that he did not know, that the company was formed by Mr. Caputo and that he was only an employee.  EcoTech was formed at the time Jenzack was pursuing Mr. Gillis for the Gillis Homes stock.  Jenzack asserts that the Labor in Vain project started prior to the formation of EcoTech and that a 10% construction management fee would have been payable to Mr. Gillis, through Gillis Homes, EcoStar, or some combination of the two (and thus become property of his bankruptcy estate), had the project not been "transferred" to EcoTech.  Based on this construct, Jenzack asserts that "It is more likely than not that EcoTech was formed by [Mr. Caputo] in an effort to shield [Mr. Gillis, his] business entities and the [project] from [Jenzack,

20

the] other creditors and/or a future bankruptcy trustee."   Mr. Gillis maintained at trial that it was

Mr. Caputo who formed EcoTech and that he had no financial interest in that company.

Mr. Gillis's testimony that the company was formed by another individual and that he

was an employee was accurate based on the record.    As to why the company was formed, that

question has not been answered and is susceptible to different interpretations and answers.  Mr.

Caputo formed EcoTech, and he did not testify at trial.  His motives for forming the company

and whether Mr. Gillis was aware of them are unknown. Thus, I cannot conclude that Mr.

Gillis's response was a knowingly false statement made with fraudulent intent.

Although Jenzack posits that EcoTech was formed to shield Mr. Gillis from Jenzack, it is

just as plausible that Mr. Caputo, who also knew the Sullivans, may have wanted a piece of the

action through his friend and client, Mr. Gillis, who had done substantial work on the project and

who had no access to needed credit at the time EcoTech was formed.  While EcoTech was

formed around the time Jenzack was pursuing Mr. Gillis, there was additional testimony that

Premier Builders was vying to replace EcoStar for the lucrative Labor in Vain project and that

Messrs. Gillis and Caputo considered the house to be a potential "stepping-stone" for future

EcoTech projects.

Moreover, Jenzack's premise that the construction management fee would have ended up

in Mr. Gillis's hands (and ultimately his bankruptcy estate) but for the "transfer" of the project to

EcoTech is speculation unsupported by the record.   Messrs. Tanner and Sullivan testified that no

contract for the project was ever signed, Mr. Gillis was involved in the due diligence phase of the

project through his business, nondebtor EcoStar, before EcoTech took over, and Jenzack

presented no evidence at trial about which entity or individual ever received a construction

management fee or the final amount of such fee.  I find no false oath in Mr. Gillis's testimony
with respect to why EcoTech was formed.

> 2.    <u>EcoTech acquired building permits through Mr. Gillis</u>

Mr. Gillis testified at the § 341 meeting that EcoTech acquired building permits through
him.  Jenzack maintains that because Labor in Vain demolition and foundation building permits
were issued by the Town of Ipswich before EcoTech was formed, EcoTech did not and could not
have applied for them.  I fail to see how Mr. Gillis's testimony on this point constitutes a false
oath.  Mr. Gillis credibly testified that EcoTech, as a construction management company,
customarily obtained building permits and that he, as a licensed construction supervisor, acquired
permits on its behalf.   The issuance of two permits in 2014, prior to the formation of EcoTech
and while EcoStar was working on the project, does not contradict or disprove Mr. Gillis's
testimony.  Moreover, the last building permit issued after EcoTech was formed listed Mr. Gillis
(and not EcoTech) as the licensed construction supervisor which Mr. Gillis testified was the
customary practice in the Town of Ipswich.   I find that Mr. Gillis's testimony about EcoTech's
acquisition of permits at the § 341 meeting was not a knowingly false statement made with
fraudulent intent material to the bankruptcy case.

> 3.    <u>Mr. Caputo dealt with customers in obtaining contracts on behalf of EcoTech</u>

Jenzack asked Mr. Gillis at the § 341 meeting whether he dealt with customers "in
obtaining contracts on behalf of EcoTech."  Mr. Gillis replied that it was Mr. Caputo, and not he,
who did so.   Jenzack maintains that this testimony amounts to a false oath, pointing to the emails
between Messrs. Tanner and Gillis regarding the draft construction agreement, the last draft of
which named EcoTech as the construction manager, and the discussions between Messrs.
Sullivan and Gillis about the 10% construction management fee.  Mr. Gillis's testimony on this

point is not a false oath.  The question was vague.  If the question was intended to inquire about

who negotiated contracts for EcoTech, Mr. Gillis credibly testified that he had no such authority,

and that Mr. Caputo "was going to handle the contract work." Although Jenzack produced emails

to and from Mr. Gillis showing his involvement in the draft construction contract, there was

insufficient evidence presented that Mr. Gillis negotiated a draft on behalf of EcoTech.  He

instructed Mr. Tanner on the name of the construction supervisor to be used and made general

representations that he would review a draft and "get it done," but these actions fall short of

negotiation on behalf of EcoTech.  Moreover, Mr. Gillis credibly testified that he referred the

draft contracts to Mr. Caputo, and Mr. Tanner testified that his discussions with Mr. Gillis were

about the technical details of the construction job.

If the question was intended to inquire about who secured contracts for EcoTech, Messrs.

Tanner and Sullivan both testified that no contract for the project was ever signed.  Hence, no

contract was ever "obtained."  I find that Mr. Gillis's testimony about who dealt with customers

in obtaining contracts on behalf of EcoTech at the § 341 meeting does not constitute a knowingly

false statement made with fraudulent intent material to the bankruptcy case.

4.    Mr. Caputo met with customers building new homes

At the § 341 meeting, Mr. Gillis confirmed that Mr. Caputo met with customers who

were "building new houses on behalf of EcoTech." Jenzack maintains that this testimony "made

it seem that [Mr. Gillis] did not meet with customers" on behalf of EcoTech, when, in fact, he

had numerous communications with the Sullivans and met with them in Florida at the inception

of the project.  The question was unclear regarding whether the inquiry was about new projects

or existing ones, and the Labor in Vain project was not a "new" home project when EcoTech

replaced EcoStar in 2014.  Additionally, Mr. Gillis went on to disclose at the § 341 meeting that

the Sullivans were EcoTech's only current client and that "we're building them a house."  Given

that he disclosed that he was building the Sullivans' house on behalf of EcoTech, I do not believe

his testimony made it seem as if he did not meet with customers.  Moreover, the question is

immaterial to Mr. Gillis's bankruptcy estate.  I find Mr. Gillis's answer does not constitute a

knowingly false statement made with fraudulent intent material to his bankruptcy case.

5.    <u>Mr. Gillis was not privy to the Labor in Vain contract</u>

Jenzack asked Mr. Gillis at the § 341 meeting when the Labor in Vain contract was first

initiated, and Mr. Gillis replied that he did not know and that he was not "privy to the contract."

Jenzack asserts that this testimony was false in light of the communications between Messrs.

Tanner and Gillis regarding the draft construction agreement and the conversations between

Messrs. Sullivan and Gillis regarding the 10% construction management fee.  While Mr. Gillis's

response to the question was imprecise, I cannot find that it was false.  Mr. Gillis credibly

testified at trial that he had no authority to negotiate contracts on behalf of EcoTech and that he

forwarded draft contracts to Mr. Caputo because "[Mr. Caputo] was going to handle the contract

work." Moreover, no final contract was ever executed between the parties.  Although the last

version of the draft contract named EcoTech as the construction manager at the request of Mr.

Gillis, it was only a draft that was never signed. I find Mr. Gillis's testimony on the above

question does not constitute a knowingly false statement made with fraudulent intent material to

this bankruptcy case.

6.    <u>Mr. Gillis did not know the rough amount of the contract for the Labor in Vain
project</u>

Jenzack asked Mr. Gillis at the § 341 meeting "how much is the contract for [the Labor in

Vain] house, roughly?"  Mr. Gillis responded that he did not know.  Jenzack asserts that that this

testimony was false.  In support, it points to Mr. Gillis's trial testimony that the Labor in Vain

project was the biggest of his career and that he had not built any other multi-million dollar

homes.  It also references the "Potential Estimated Savings Document," the estimated cash flow

statement, and Addendum B for the project Mr. Gillis prepared in 2014 which reflected a

construction budget of approximately $3.7 million and a 10% management fee projected through

2016.  Jenzack maintains that given Mr. Gillis's extensive work and involvement with the project

from its inception, including his preparation of the above financial documents, he should have

been able to provide a "rough amount of the contract" for the project at the meeting.

The question about the amount of the contract was posed to Mr. Gillis in the present

tense.  The financial documents relied on by Jenzack were prepared in 2014, nearly two years

before the § 341 meeting.  They reflected cost estimates as of that time and were not current.

And Mr. Gillis prepared them for his company, EcoStar, before EcoTech, owned by Mr. Caputo,

began working on the project.  Mr. Sullivan also testified that as the project progressed, most of

his conversations about costs were with Mr. Caputo, not Mr. Gillis. According to Mr. Gillis's §

341 meeting testimony, the project was only seventy-five percent complete at the time of the

meeting in August of 2016, and he credibly testified at trial that he did not know the amount of

the contract at the time of the § 341 meeting.  The record reflects that the project costs were a

moving target.  Indeed, Mr. Tanner testified that no final contract was ever signed due to

disagreement among the parties about construction costs.  While Mr. Gillis could have

speculated about a rough amount of the "contract" at the § 341 meeting, I cannot find any

fraudulent intent on his behalf for failing to do so, particularly where the undisputed evidence

established that no final contract was ever signed and Mr. Gillis did not control or have a

financial interest in EcoTech.  I find Mr. Gillis's testimony on the above question does not

constitute a knowingly false statement made with fraudulent intent material to this bankruptcy case.

### 7. The Labor in Vain project started in 2015

Jenzack asked Mr. Gillis at the § 341 meeting when construction on the Labor in Vain house started, and Mr. Gillis replied "beginning of last year," referring to 2015. Jenzack asserts that the testimony was false and intended to convey that the *project* began after EcoTech was formed while the evidence showed that the *project* was underway in 2013 when the Sullivans purchased the Ipswich property. Mr. Gillis was asked about the date construction on the house began, not when the *project* began. Mr. Gillis testified at trial that the foundation for the new house was poured between November and December of 2014 and that construction on the house then began in 2015, the same year he referenced at the § 341 meeting. I find no false statements in Mr. Gillis's testimony on this point.

### 8. No assets, contracts, or projects of any kind transferred to EcoTech from Gillis Homes

Mr. Gillis testified at the § 341 meeting that no assets of Gillis Homes were transferred to EcoTech. When asked at the meeting by Jenzack whether any contracts or projects "carried over" from Gillis Homes to EcoTech, he replied "No." Jenzack maintains that these were false oaths by Mr. Gillis. In support, it points to the Order of Conditions issued by the Massachusetts DEP on October 18, 2013, which referenced "Gillis Homes," early drafts of the construction agreement which referenced "Gillis Homes and/or Steven Gillis" as the construction manager, Gillis Homes' role as the real estate brokerage company for the property, Mr. Gillis's use of his Gillis Homes email address during the course of the project, and various project invoices bearing the name Gillis Homes as the customer or payor. Based on this evidence, Jenzack asserts that

the Labor in Vain project began as a Gillis Homes project that was transferred first to EcoStar

and then to EcoTech.

Mr. Gillis credibly testified that Gillis Homes stopped building homes in 2007 or 2008,

that other than acting as the Sullivans' broker, Gillis Homes had nothing to do with the Labor in

Vain project and that he did not hold out the project as a Gillis Homes job.  He noted that Gillis

Homes built more than 100 homes over the years and, during that time, he did business with

vendors such as Express Signs, Dave's Septic, Piping Specialties and the site engineer, Meridian

Associates, who were also involved in the Labor in Vain project.  He testified that he did not pay

close attention to the vendors' invoices because they "had no significance" to him at the time.

Similarly, he continued to use the Gillis Homes email address in connection with the project as a

matter of convenience because that was the address at which industry professionals had reached

him for years. I attribute no weight to the use of "Gillis Homes and/or Steve Gillis" in the early

drafts of the construction agreement (which was never finalized) by Mr. Tanner because his

client, Mr. Sullivan, testified that he believed he was hiring Mr. Gillis, and was indifferent to the

entity for whom he worked.  Similarly, the referenced invoices were not created by Mr. Gillis but

by third parties.  Given Mr. Gillis's forty years in the building trade through different entities, it

is not unreasonable to conclude that vendors used the wrong customer or payor name by

inadvertence.  In fact, some of the packing slips issued to Gillis Homes were sent after Mr. Gillis

transferred its stock to Jenzack.

In short, I do not find the evidence proffered by Jenzack establishes that the Labor in

Vain project was transferred from Gillis Homes to either EcoStar or EcoTech.  No formal

contract was ever signed for the project, and no evidence was presented regarding the diversion

of any construction management fee to put it beyond the reach of Mr. Gillis's creditors.  Rather, I

find that Mr. Gillis worked on the project at different phases through different entities.  First, he

acted as a broker through Gillis Homes for the purchase of the property in 2013 and thereafter he

performed the due diligence phase of the project through another company, EcoStar, until the

end of 2014 when EcoTech began work on the project.  Mr. Gillis continued to work on the

project through his employer, EcoTech, and then later directly for the Sullivans after EcoTech

was terminated following the bankruptcy filing. I find Mr. Gillis's above testimony at the § 341

meeting does not constitute a knowingly false statement made with fraudulent intent.

9. Mr. Gillis only worked for EcoTech for 12 months

Mr. Gillis filed his Schedule I on July 17, 2016, in which he reported that he was

employed by EcoTech for "12 months." When asked at the § 341 meeting in 2016 when he

began working for EcoTech, he stated "last year" meaning 2015. Jenzack asserts that these

statements were false oaths because EcoTech was formed on November 4, 2014, and Mr. Gillis

testified at trial that he worked for EcoTech "from the beginning."

Jenzack maintains that the above statements made it appear that the Labor in Vain project

began after the formation of EcoTech.  While any inaccurate response in a schedule or at a

creditors' meeting could lead to a false assumption by a creditor, that is not the sole test for false

oath.  With respect to Mr. Gillis's statement at the meeting that he started working for EcoTech

"last year," that answer was an approximation and inaccurate by less than two months.  I find the

statement was not knowingly false.   With respect to the "12 month" response on Schedule I, Mr.

Gillis credibly testified at trial that it took him several months to prepare his bankruptcy

schedules before they were actually filed with the court and that he did not realize the "12

month" answer was inaccurate when he filed his schedules.  I consider the mistake an oversight

and his explanation to be adequate under the circumstances given his complicated business

affairs, and not made with fraudulent intent.

10. <u>EcoStar ceased to exist in 2014</u>

In response to Question 27 on his original SOFA, Mr. Gillis listed, among numerous

entities, EcoStar's dates of existence as "February 12, 2010 through January 22, 2014." Mr.

Gillis testified at trial that the end date was inaccurate by a year and should have been listed as

January 22, 2015.  He credibly testified that he used the January 22, 2014 end date because that

was the date he filed EcoStar's last annual report with Massachusetts Secretary of State, not

realizing that the report was "good for a year."  He added that at the time he filed the original

SOFA, he did not realize the error and that he later amended the SOFA to correct the inaccuracy

which I find to be a satisfactory explanation of the initial mistake.   I find Mr. Gillis's above

statement in the original SOFA was an honest oversight and not knowingly false.

11. <u>Mr. Gillis did not gift anything to anyone within two years of his bankruptcy filing</u>

Mr. Gillis reported in Question 13 of the SOFA that he had not gifted anything to anyone

worth over $600 within two years of the bankruptcy filing date.  Jenzack asserts that statement

was a false oath, relying on the five aggregated invoices sent to the Sullivans by EcoStar through

October of 2014 and the sixth invoice then sent by EcoTech in November of 2014.  Based on the

facial similarities between these invoices, Jenzack asserts that EcoTech was a "mere successor to

EcoStar" with respect to the Labor in Vain project.  It maintains that the project was transferred

by EcoStar to EcoTech for no consideration and that "a portion of any monies to be realized by

EcoStar would have likely passed through to [Mr. Gillis]."  As discussed above, this is

supposition and not supported by the record.  Even if EcoTech was the "mere successor" of

nondebtor EcoStar, that does not establish that Mr. Gillis provided a false answer on the SOFA

which inquired about gifts *he* may have made. I find no false oath with respect to Mr. Gillis's answer to Question 13 on the SOFA.

12. <u>Mr. Gillis did not sell, trade, or otherwise transfer any property to anyone within two years of the bankruptcy filing</u>

In response to Question 18 of the SOFA: "did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs" within two years of the bankruptcy filing, Mr. Gillis responded "No." Jenzack asserts that this answer was a false oath, again relying on the aggregated invoices issued by EcoStar through October 2014 and then by EcoTech in November of 2014, to conclude that the project was transferred from EcoStar to EcoTech after October of 2014. I find no false statement in Mr. Gillis's answer to Question 18 of the SOFA for the reasons stated above. Moreover, the question required information only about *his* transfers and not those of any companies he owned.

13. <u>Mr. Gillis did not control the assets of another</u>

In response to Question 23 of the SOFA: "Do you hold or control any property that someone else owns?" Mr. Gillis responded "No." Jenzack asserts that response was a false oath because Mr. Gillis had signatory authority over the Sullivans' petty cash account, control and possession of a checkbook, and could have withdrawn money from that account any time. Mr. Gillis credibly testified that he considered the account to be owned and controlled by Mrs. Sullivan who also had access to the funds and could remove them at any time. He maintained that he had personal possession of an account checkbook due to the need, in the course of his employment by EcoStar and EcoTech, to buy fuel and remove large quantities of snow that fell during the winter of 2015, and otherwise to make small purchases for the project. He credibly testified that he did not believe he controlled the account even though he could have withdrawn funds from it. I find that Mr. Gillis believed his statement was true when he made it and there

was no knowledge of falsity.  Moreover, the omission of the petty cash account from his answer

on the SOFA was not material to his bankruptcy case.

    14. <u>Additional facts</u>

    Lastly, Jenzack maintains that Mr. Gillis's initial reluctance at the § 341 meeting to

reveal the name of EcoTech's only client, the Sullivans, is further evidence of his intent to hide

the truth about the Labor in Vain project because it was a Gillis Homes project.  Jenzack has not

carried its burden of demonstrating that the project was somehow transferred from Mr. Gillis or

nondebtor Gillis Homes, fraudulently or otherwise.  Given the circumstances, Mr. Gillis's

momentary reluctance to reveal the names of EcoTech's client was understandable as he was still

working for the Sullivans through EcoTech.  He adequately explained that his hesitation was to

avoid involving the Sullivans in this "mess," a concern that proved to be well-founded as

Jenzack deposed Mr. Sullivan in this litigation and called him as a witness at trial.  Under the

circumstances, I do not find Mr. Gillis's initial pause part of a pattern to "hide the truth" about

the project.

## V. <u>Ruling</u>

    Construing § 727 liberally in favor of Mr. Gillis as I must, and after careful review of the

evidence presented, I find no knowing and fraudulent oaths made by him, or any reckless

disregard for the truth, relating to material facts in this bankruptcy case reflected or contained in

his schedules, statements or § 341 meeting testimony.  Jenzack failed to carry its burden of

proving false oath by a preponderance of the evidence with respect to the above enumerated 14

statements.  Judgment shall enter in favor of Mr. Gillis and against Jenzack on count II of the amended complaint.

Dated: December 26, 2019

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:    Jonathan H. Allen, Esq.
Peskin, Courchesne & Allen, P.C
Springfield, MA
for the plaintiff, Jenzack Partners, LLC

Andrew W. Evans, Esq.
Law Offices of Evans & Evans, P.C.
Peabody, MA
for the defendant, Stephen J. Gillis